In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2428

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RONNIE LAUDERDALE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:07-cr-30052-GPM-1—**G. Patrick Murphy**, *Judge.*

ARGUED JUNE 1, 2009—DECIDED JULY 6, 2009

Before EASTERBROOK, *Chief Judge*, and BAUER and
EVANS, *Circuit Judges*.

BAUER, *Circuit Judge*. In December 2007, Ronnie Lauder-
dale was tried for conspiracy to distribute and possess
with intent to distribute more than five kilograms of
cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846;
and possession of a firearm by a previously convicted
felon in violation of 18 U.S.C. § 922(g)(1). After the jury
was unable to reach a unanimous verdict, a new trial

was scheduled to commence some six weeks later. In the days leading up to the second trial, the government disclosed new evidence to Lauderdale. Lauderdale moved to exclude that evidence on the grounds that it was provided to him at the eleventh hour; the district court considered the motion, but delayed a ruling. During the trial, with the judicial determination on the admissibility of the evidence still pending, the government elicited witness testimony concerning the evidence. Lauderdale moved for a mistrial, alleging bad faith by the government and resulting prejudice. The district court denied that motion, but then ruled to exclude much of the originally-challenged evidence.

The trial proceeded to verdict and this time, the jury returned a conviction. On appeal, Lauderdale argues that the district court erred in denying his motion for a mistrial. We affirm.

## I.  BACKGROUND

After Lauderdale's first trial resulted in a hung jury on December 27, 2007, the case was reset for trial on February 11, 2008. Between the two trials, the government provided defense counsel with several hundred pages of telephone records which it intended to introduce as corroborative evidence of the alleged drug conspiracy. The records were produced in two installments; the first approximately two weeks before trial, and the second on the eve of trial. Lauderdale, through counsel, requested a continuance based on the short setting and the amount of newly disclosed evidence; he also filed

a motion *in limine*, urging the court to exclude this evidence from trial. The government advised the court that it had produced all the phone records within 24 hours of receiving them from the cellular telephone providers. The court denied the continuance but admonished the prosecutor, stating "I can't imagine I would let you use this at this late date. I'll consider it." The court continued, "[i]t's dangerous for a judge to say never but my inclination is I'm going to grant this motion, but it's under advisement." The case proceeded to trial.

The government's case consisted of the testimony of cooperating witnesses Jesse Lee Hale and John Ball; the statements made at the time of arrest by Lauderdale, Hale, and Ball; statements of two jailhouse informants; and corroborating records. The evidence presented established that Ball and Hale grew up together in Madison, Illinois. Hale later moved to Turrell, Arkansas, where he met Lauderdale. Lauderdale began moving large quantities of cocaine and offered Hale a piece of the action; Hale, in turn, recruited his friend Ball to join the business. The three men began distributing cocaine together.

Lauderdale obtained the cocaine from Mexican suppliers; Ball distributed it on the local streets; and Hale acted as the middleman, often delivering the drugs to Ball in Illinois and staying behind to collect money. After numerous successful transactions, something went awry.

In late September 2006, the men met in a hotel room in Sikeston, Missouri where they counted out 20 kilograms

of cocaine and placed the drugs in a black duffel bag. Ball and Hale then drove to Madison, while Lauderdale returned to Arkansas. Ball arranged to sell 1.5 kilos of the supply to two buyers, but the transaction didn't go down; instead, the two men robbed Ball at gunpoint and made off with the cocaine. In a rather bold but foolish move, Ball flagged down police officers and told them that he had been robbed. The officers were able to apprehend one of the men and brought him and Ball to the police station. Ball then provided police with a mind boggling complaint: what the thieves had stolen was not money but cocaine and, apparently by way of full disclosure, Ball said he had an additional 18.5 kilograms of it, along with two guns, in his house.

Ball took the officers to his house to show them the goods but the cocaine was not there. Unbeknownst to Ball, it had been moved by his uncle who, having received word of his nephew's arrest, took possession of the cocaine. Hale and Lauderdale also got wind of Ball's predicament. When Lauderdale learned the news, he drove to Madison immediately, obtained the duffle bag of cocaine, and rented a hotel room in the area. Like a game of hot potato, numerous accomplices briefly held, then passed along, the cocaine over the course of several days.

As to Ball, the jig was up. Ball spoke to Hale by telephone and told him to come over with the cocaine. When Hale arrived, police arrested him. Although Hale did not have the cocaine, he helped police recover the drugs. Lauderdale was arrested shortly thereafter; when police searched his car, they found a gun.

The government also presented testimony from Frederick Goss and Marcel Fields, prison inmates who were housed in the detention center with Lauderdale. Goss testified that, during a game of chess, Lauderdale told Goss that he had a business partner in Madison, Illinois who was robbed of 1.5 kilograms of cocaine. According to Goss, Lauderdale also told him that his partner was testifying against him and that he wished he could pay someone to kill him. According to Fields, Lauderdale stated that he had been seen by Ball's girl-friend transporting cocaine, and that Lauderdale wanted her dead. Lauderdale enlisted Fields to provide someone who could accomplish this and agreed to pay Fields $5,000 to do so.

On the final day of trial, Drug Enforcement Administration (DEA) officer Brian Lammers testified that he and another DEA officer interviewed Lauderdale at the Madison, Illinois police department following Lauderdale's arrest. Lauderdale was made aware that other suspects were cooperating and that, based on the cocaine which had been seized, he was facing a possible sentence of life imprisonment. Lauderdale then related an account of his involvement in the drug conspiracy that was con-sistent with that told by Hale and Ball. According to Lammers, Lauderdale stated that he received the black duffel bag containing the 20 kilograms of cocaine via a courier from his Mexican supplier. At the hotel room in Sikeston, Missouri, Lauderdale turned the cocaine over to Hale and Ball, who were to transport it to Madison, Illinois. However, when Lauderdale received a call later that night from Hale informing him that "a

problem" had arisen, he also drove to Madison, where he was arrested by police.

Lammers further testified that Lauderdale's cellular phone records established that Lauderdale was in communication with Ball on September 23, 2006, and with Hale on September 22 through 24, 2006. Lauderdale also called Ball on the morning of September 25, 2006, the day the three men met in Sikeston, Missouri. After the call to Ball's phone, there were two calls between Lauderdale and Hale. Finally, there were a series of calls between Lauderdale and Hale on the evening of September 25, 2006, the day Ball was arrested. Lammers then discussed Ball's cellular phone records.

Lammers also identified a number of government exhibits relating to the telephone records. At that point, Lauderdale's counsel requested a sidebar and objected to the admission of the telephone records, contending that they were the subject of his earlier *limine* motion. The district court noted that it had not yet ruled on Lauderdale's motion to exclude certain documents. The government continued with its direct examination of Lammers.

Thereafter, Lauderdale's counsel moved for a mistrial, arguing that the government had used exhibits containing phone records that had been excluded by the court pursuant to Lauderdale's motion *in limine*. The court stated that it would go back and consider the earlier order on the motion *in limine*.

Following a break, the court reconvened outside the presence of the jury. It noted that Lauderdale's motion *in limine* had been taken under advisement, but not ruled

upon as Lauderdale had asserted. The court then elected to admit the exhibits concerning records produced two weeks before trial and bar the exhibits produced on the eve of trial.

At the trial's conclusion, the jury found Lauderdale guilty of both counts; the district court sentenced him to a term of life imprisonment for the drug conspiracy conviction and a concurrent term of 360 months' imprisonment for the unlawful possession of a firearm conviction.

## II. DISCUSSION

On appeal, Lauderdale contends that the district court erred in denying his motion for a mistrial. He argues that a mistrial was necessary because, by adducing witness testimony concerning the challenged records, the government deliberately disregarded the court's *de facto* ruling that the records would be excluded and, in doing so, "snuck in" evidence that was critical to his conviction. Moreover, he argues, the district court's refusal either to delay the trial's start and allow sufficient time for review of the late-arriving records or deliver on its assurance that it would exclude the records in full, rendered the trial fundamentally unfair.

We review the district court's denial of a motion for a mistrial for an abuse of discretion. *Unites States v. Bermea-Boone*, 563 F.3d 621, 625 (7th Cir. 2009). We use such a highly deferential standard of review because, "the trial judge is in the best position to determine the seriousness of the incident in question, particularly as it relates to

what has transpired in the course of the trial." *United States v. Danford*, 435 F.3d 682, 686 (7th Cir. 2006) (internal quotation marks and citation omitted). The essential inquiry is whether Lauderdale was deprived of a fair trial. *Id.*

Lauderdale argues that the government's actions amounted to prosecutorial misconduct and compromised the fairness of his trial. To evaluate such a claim, we engage in a two-step analysis. *United States v. White*, 222 F.3d 363, 370 (7th Cir. 2000). We first examine the challenged remarks in isolation to determine whether they were improper; if they were, we look at the remarks in the context of the entire record to determine whether they could have so prejudiced the jury that the defendant cannot be said to have received a fair trial. *Id*.

Here, neither the government's direct examination of Lammers concerning the telephone records nor its use of exhibits containing those records violated an existing court order. As the district court noted, Lauderdale's pretrial motion *in limine* to exclude the records had been taken under advisement, but never ruled upon.

Nevertheless, Lauderdale contends that in light of the district court's indication that it would probably disallow the use of such eleventh hour discovery, the government's decision to press forward on the subject matter violated the spirit if not the letter of the law and was improper all the same.

We disagree. Lauderdale's argument ignores a key development that took place during the course of the trial. The record suggests that the district court had

softened on its stance on disallowing use of the records. In response to Lauderdale's objection to Lammers' identification of the government's exhibits containing the records, the prosecutor stated, "[t]he reason I even began with [the disputed phone records] is because the Court will recall, in chambers yesterday, you commented that at this point [Lauderdale] had ample opportunity to review them, having received them last week and [now] a week deep into trial." Shortly thereafter, when the district court excluded the majority of the challenged records, it noted, "[n]ow look, this is not a case where the Court is suggesting with regards to these exhibits that the [government] did something improper. It did not."

The district court's comments throughout trial demonstrate that, in its view, the admissibility of the telephone records hinged on timing. The district court opted to delay a decision on whether the government would be allowed to use the telephone records until the point at trial when it sought to do so. By withholding a ruling until that time, the court could better reflect on how limited or sufficient was defense counsel's opportunity to review and meet the evidence. It was not an unqualified certainty that the district court would exclude the records in their entirety. Understanding this, the government proceeded with aggressive but fair trial tactics.

Having established that there was no prosecutorial misconduct, we need not consider whether Lauderdale was prejudiced by the prosecutor's trial tactics. Still, we

return to the essential question of whether Lauderdale received a fair trial. It is clear to us that he did.

It may be true that, had the district court granted Lauderdale's motion for a continuance, defense counsel would have been afforded the opportunity to more thoroughly review and prepare the telephone records for trial. It may also be true that some of Lammers' testimonial statements, made in the presence of the jury, related to evidence later ruled inadmissible. However, neither the telephone records themselves nor the corresponding testimony introduced new proof of Lauderdale's guilt. Far from being critical, these records were simply cumulative.

During their respective testimonies, Hale and Ball each made numerous references to the other co-conspirators' use of telephones to communicate with one another. Moreover, independent of the excluded evidence, the district court admitted several exhibits which were corroborative of the telephone records. For example, although the records relating to one of Lauderdale's mobile phones were excluded, the physical telephone that corresponded to those records and the phone's call history log that demonstrated communication with Hale were admitted into evidence without objection.

It also bears noting that, without a single mention of the phone records, the weight of the evidence presented at trial was more than sufficient to establish Lauderdale's guilt beyond a reasonable doubt. The jury heard testimony concerning Lauderdale's post-arrest statement in which he admitted to transporting the cocaine involved

in the conspiracy, along with the testimony of each of Lauderdale's co-conspirators, Hale and Ball, attesting to Lauderdale's instrumental role in the drug ring. Two of Lauderdale's prison acquaintances also testified that Lauderdale expressed his desire and intention to have incriminating witnesses killed. Lauderdale's contention that the district court abused its discretion in denying a mistrial is without merit.

For the reasons set forth above, we AFFIRM Lauderdale's conviction.