In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 13-3715 & 13-3727

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRIAN WILBOURN and ADAM SANDERS,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 07-cr-00843 — **Joan Humphrey Lefkow**, *Judge.*

ARGUED APRIL 22, 2015 — DECIDED AUGUST 26, 2015

Before FLAUM, MANION, and HAMILTON, *Circuit Judges.*

MANION, *Circuit Judge.* Over a decade ago, federal author-
ities conducted an investigation of the drug trade at the
now-razed Cabrini-Green housing projects in Chicago. That
investigation, which centered on a drug conspiracy headed
by Rondell Freeman, yielded a thicket of defendants and
charges spanning a period of almost nine years. Altogether,
fifteen persons were charged, ten pleaded guilty, and five

went to trial, including our defendants, Brian Wilbourn and Adam Sanders.

At trial, Wilbourn and Sanders conceded that they sold drugs at Cabrini-Green but claimed to do so as small-scale, independent dealers and not as part of Freeman's organization. The jury disagreed and convicted them of multiple charges, including participation in the conspiracy. Following the trial, the district court vacated and granted a new trial on several charges, including conspiracy, because the government secured those convictions through testimony that it had good reason to know was false. The government appealed, and we affirmed in *United States v. Freeman*, 650 F.3d 673 (7th Cir. 2011). On remand, the government elected not to go forward with the vacated counts, and the district court sentenced Wilbourn to 184 months and Sanders to 160 months on the undisturbed counts.

They have appealed and challenge several rulings of the district court. For the reasons that follow, we affirm each of the district court's rulings except for three: we reverse the court's denial of Sanders' motion to suppress and remand for a new trial Sanders' conviction under Count 32; we likewise vacate Wilbourn's conviction under Count 4 and remand it for a new trial; and we vacate Wilbourn's sentence and remand his case to the district court to make new findings regarding the applicable drug quantity.

## I. Background

Brian Wilbourn, Adam Sanders, and thirteen others were charged with participating in a conspiracy to manufacture and distribute narcotics and various related offenses. We

covered extensively the details of the government's case in *Freeman* and recount here only those facts necessary to understand the issues relevant to this appeal. In short, the government alleged that the defendants, with Rondell Freeman serving as the ringleader, formed a conspiracy to sell narcotics at the Cabrini-Green housing project in Chicago. The conspiracy involved approximately fifteen persons and ran from 1998 until at least December 2007.

The government presented a bold case over the course of the five-week trial. Utilizing video and audio clips, testimony from informants, and evidence culled from garbage pulls, the government contended that Wilbourn and Sanders served in leadership roles in Freeman's conspiracy and not as small-time, independent drug dealers, as they claimed in defense. For the most part, the jury accepted the government's case and convicted both Wilbourn and Sanders on multiple counts, including conspiracy.

What the jury did not know, however, was that a significant aspect of the testimony of Seneca Williams—one of the government's key witnesses—was false. Williams had testified that Wilbourn played a prominent role in the conspiracy and that he frequently witnessed him engaging in drug trafficking activities at Freeman's penthouse apartment. The problem with Williams' testimony was that the penthouse apartment was only used during 2003 and Wilbourn could not have been present because he was in jail for the whole of that year. Still more problematic, the government elicited this testimony (and argued a variation of it in closing argument) even after the defense counsel had presented it with reliable information demonstrating that Wilbourn spent the whole of 2003 in jail and so could not have been present.

After the trial, the district court partially granted the defendants' motion for a new trial and vacated several counts against Wilbourn and Sanders, including the conspiracy. We affirmed and remanded the vacated counts for a new trial. *Freeman*, 650 F.3d at 683–84. On remand, the government elected not to go forward with the vacated counts and the district court proceeded to sentence the defendants on the undisturbed counts.

Wilbourn received a 184-month sentence (reduced from 200 months) based on his convictions on five counts: possession with intent to distribute narcotics (Counts 3, 12 and 13; 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2); using a telephone to facilitate a conspiracy (Count 4 or "phone count"; 21 U.S.C. § 843(b)); and being a felon in possession of a firearm (Count 7; 18 U.S.C. § 922(g)(1)).

Sanders received a 160-month sentence for his convictions on five counts: using a telephone to facilitate a conspiracy (Counts 19, 20, 21, and 30 or "phone counts"; 21 U.S.C. § 843(b)) and possession with intent to distribute narcotics (Count 32; 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2).

The appeal addresses five discrete issues: (1) whether drugs seized from a car in which Sanders was a passenger should have been suppressed; (2) whether the phone counts should be vacated where they are premised on a drug conspiracy that has been dismissed; (3) whether the district court correctly handled premature jury deliberations; (4) whether the district court should have granted a mistrial where the government entered evidence against Wilbourn after it had rested its case against him; and, (5) whether the court erred in sentencing Wilbourn based on relevant conduct.

We address the facts relevant to each of these issues.

*A. Car Search*

Throughout the investigation, agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) maintained surveillance on Freeman's residence at Sheridan Road in Chicago. During their surveillance, which eventually included a wiretap of Freeman's telephone lines, the agents gathered evidence of drug trafficking conducted at the Sheridan Road residence by numerous individuals. Over a period covering almost two years, the police conducted more than a dozen trash pulls and recovered plastic baggies containing the residue of various narcotics that resembled bags discarded by Freeman's associates. Agents also observed Sanders enter Freeman's Sheridan Road residence and intercepted various calls between Freeman, Sanders, and other defendants.

On November 13, 2006, the ATF agents observed a Dodge Intrepid registered to Wilbourn's mother parked in a lot outside Freeman's Sheridan Road residence. At approximately 8:40 p.m., three black males, one resembling Wilbourn, got into the Dodge. The agents surveilled the automobile as it drove to a nearby gas station and pulled up next to a maroon Buick registered to a co-defendant named McClatchey. Chicago Police Officer Pat Munyon, who was assisting the surveillance operation, pulled in behind the Buick in the gas station. From his vantage point, he observed a black male exit the back seat of the Buick, approach the Dodge, and lean into the front passenger side. He remained there for approximately ten seconds before returning to the Buick. Officer Munyon did not record observing any drugs during this exchange.

The Buick left the gas station and travelled west for several blocks before it was stopped by Chicago police officers Jason Schoenecker and Michael Corlett. The officers observed two females sitting in the front seat and a male passenger in the back seat and instructed the male passenger to exit the vehicle. Recognizing the passenger as Adam Sanders, the police officers placed Sanders in the back seat of the police vehicle. The officers then searched the back seat area and smelled a strong odor of crack cocaine. Searching underneath the front passenger seat, they recovered a black plastic bag which contained several hundred smaller baggies, each of which, in turn, contained a rock of crack cocaine. One of those smaller baggies contained a larger, 18-gram rock, while the others contained less than a gram. A number of the baggies bore the orange and white marking (120 baggies total) associated with drugs sold by Wilbourn, while others carried the blue-devil marking (404 total) associated with Freeman. Laboratory analysis of the bags verified that the individual crack rocks contained approximately 77 grams of cocaine base.

Four days after the stop, ATF Special Agent Edward Piacenza prepared a report of the incident that incorporated the account of the event given to him by Officer Schoenecker. This report described the incident as a traffic stop but failed to provide any details about a traffic violation or questioning of the driver related to a traffic incident. The report went on to describe the search conducted by Officers Schoenecker and Corlett and the seizure of the drugs. Five months later, Officer Munyon, who had observed the Buick at the gas station, prepared a report which provided additional detail about his observations. He stated that he observed Sanders sitting in the back seat of the Buick "making tucking and

pushing motions with his arms towards the lower area of the seat."

The district court ruled that Sanders' Fourth Amendment rights were not violated because, as a passenger, he had not demonstrated a legitimate expectation of privacy in the Buick. It also provided a second justification for the search, ruling that it constituted a protective sweep of the car following a valid *Terry* stop because the officers' surveillance (and larger investigation) provided reasonable suspicion that the passenger in the back seat of the Buick had committed a crime and that there might be a weapon in the car.

### B. Phone Counts

Both Sanders (three counts) and Wilbourn (one) were found guilty of using a telephone in furtherance of the conspiracy charged in the indictment. Following trial, the district court vacated and granted a new trial on the conspiracy charge and we affirmed this ruling. On remand, the government did not re-try any of the vacated charges but elected to proceed to sentencing on the undisputed convictions.

On appeal, the defendants argue that the telephone counts should be vacated because they are legally and factually dependent on facilitating "the felony … as charged in Count One." Because the felony in Count One—the Freeman conspiracy—was vacated, the phone counts must also be vacated, according to the defendants. Additionally, Wilbourn argues that there is insufficient evidence to support his conviction.

### C. Premature Jury Deliberations

On the fifth day (out of eighteen) of witness testimony, Patrice Shadd, a girlfriend of one of the defendants, sat next

to a table of jurors at lunch. She testified that she overheard those witnesses discussing the trial. According to Shadd, one juror opined that two of the defendants were guilty; a second juror agreed and stated that two were guilty but did not know about the others; and, a third juror expressed general agreements with these statements. Shadd identified for the court the three jurors who were active in this conversation.

The government opposed conducting a voir dire on the jury because it would be disruptive and might cause jurors to wonder whether they were being watched outside of court. Ultimately, the district court instructed the jurors not to make up their minds or discuss the case with each other until they heard all of the evidence and were instructed by the court to discuss the merits of the case. Following the instruction, the judge asked the defense whether they sought removal of the jurors alleged to have participated in the conversation. Counsel for the defense declined to have them removed.

### D. Wilbourn's Motion for a Mistrial

After the government had rested its case, Wilbourn indicated his intention to proceed to closing arguments without presenting any evidence. Three of the other defendants had also rested their case and the judge instructed the jury that "any evidence that's presented after a defendant rests is not to be considered against that defendant."

Freeman did not rest his case. Instead, he sought to present to the jury a videotape showing an undercover informant who tried to purchase drugs but was unable to do so when he was confronted by various sellers shouting out different lines of drugs, none of which was the "blue devil"

product associated with Freeman. By showing several deal-
ers hawking various other lines of drugs, Freeman sought to
disprove the government's theory that his operation had a
monopoly of control over that territory to sell his "blue dev-
il" product.

None of the defendants was depicted on the video. Wil-
bourn's counsel did not object to its introduction but asked
the government to stipulate that none of the defendants was
on the video. The government agreed to do so but stated,
"we'd also want evidence to come out that [the dealers in the
video] were shouting out blue devs and orange stripes."

Freeman called ATF Special Agent Joseph Delucio to in-
troduce the videotape. On cross-examination, the prosecutor
asked whether the agent heard "people in the building yell-
ing orange stripes?" Agent Delucio answered "yes." The
prosecutor then asked a follow-up question in which Agent
Delucio clarified that it was the sellers yelling "orange
stripes." Wilbourn then moved for a mistrial on grounds that
the government, by eliciting that testimony, sought to enter
evidence solely to impute guilt against Wilbourn because
previous testimony had linked him to the "orange stripe"
brand. The judge denied the motion.

## E.   Wilbourn's Sentence

At sentencing, the government argued that, although the
conspiracy count had been dismissed, he could still be sen-
tenced as if he were a co-conspirator because the govern-
ment had established by a preponderance of evidence that
he was a member of Freeman's drug trafficking organization.
The court accepted this argument and found Wilbourn "ac-
countable … for all of the drugs procured and sold by the

Freeman [drug trafficking organization] from March 11, 2002 through May 24, 2007." This drug amount consisted of more than 8.4 kilograms of crack cocaine, and 99.7 grams of heroin. This drug amount corresponded to a base offense level of 38.

In contrast, Wilbourn argued that he had been in prison for large periods of time under which the conspiracy operated and could not have had any role in any drug trafficking conducted by Freeman's operation. Instead, he contended that he was responsible only for those drugs he personally sold after he was released from prison, an amount that corresponded to a base offense level of 26.

## II. Analysis

### A. Car Stop

We adopt a mixed standard of review on motions to suppress, reviewing the district court's factual determinations for clear error and *de novo* its ultimate determination about whether the police had sufficient grounds to stop or search the individual. *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

Before trial, Sanders moved to suppress the introduction into evidence of the drugs seized from the Buick. Deciding the issue on the briefs, the district court denied the motion because, as a passenger with no possessory interest, Sanders lacked an expectation of privacy in the Buick. It also provided an alternate justification, finding that the original stop was valid under *Terry v. Ohio*, 392 U.S. 1 (1968), because the officers had reasonable suspicion to believe that drugs were present in the car due to facts known to the officers as a re-

sult of their investigation of the Freeman drug trafficking organization. The court then deemed the search valid as a protective sweep because law enforcement had reason to believe that Sanders might possess firearms based on an intercepted call in which Sanders had asked Freeman for a gun.

Passengers in cars stopped by police are deemed "seized" for Fourth Amendment purposes and are entitled to challenge the constitutionality of the detention. *Brendlin v. California*, 551 U.S. 249, 251 (2007). This principle, however, does not extend so far that it recognizes a legitimate expectation of privacy for passengers who do not have a possessory interest in a vehicle. *See United States v. Walker*, 237 F.3d 845, 848–49 (7th Cir. 2001). This limits the scope of Sanders' challenge somewhat: because he was a passenger with no possessory interest in the car, he must demonstrate that the stop itself was not justified and that the evidence obtained was derived from an illegal stop (in contrast to an illegal search after a proper stop, which he would lack standing to challenge).

The district court rightly disregarded the officers' first justification as a traffic stop because they neither cited nor investigated any traffic violation. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) ("A stop for a routine traffic violation justifies a police investigation of that violation."). The Fourth Amendment allows officers to "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 21). "Reasonable suspicion" has never been reduced to a mechanical formula, but embodies "something less than proba-

ble cause and more than a hunch." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005). A mere suspicion of illegal activity at a particular place is not enough to transfer that suspicion to anyone who leaves that property. *United States v. Bohman*, 683 F.3d 861, 864 (7th Cir. 2011).

Ultimately, the district court accepted the government's argument that the police officers had a reasonable suspicion to stop the Buick based on facts known to them as a result of the investigation of the Freeman drug organization. But there is a problem with this: none of the evidence in the record demonstrates that the individual officers (Schoenecker and Corlett) knew anything about the persons inside the Buick at the time of the stop. In its twenty-seven-page response brief, the government recounted an impressive list of surveillance operations and phone intercepts depicting various encounters between Freeman, Sanders and other persons. But none of this addressed the central question—whether Officers Schoenecker and Corlett (and not other agents) had a reasonable suspicion that the persons in the Buick were engaged in criminal activity. None of the evidence suggests that the officers participated in these surveillance operations before they encountered the Buick. There is no indication that they were present at the gas station when Officer Munyon observed the encounter between the passenger and the Dodge. There is no evidence that the officers derived their suspicions as a result of facts provided to them by the other agents.

Sanders attached to his suppression motion a report written four days after the incident by ATF Special Agent Edward Piacenza. This report contains an account of the stop as described (to SA Piacenza) by Officer Schoenecker. It de-

scribes the stop as a traffic stop but gives no account of any traffic violation cited. More significantly, however, the report provides no other justification for the stop; indeed, the contents nowhere indicate that Officers Schoenecker or Corlett knew anything about the persons in the Buick prior to making the stop. One might presume that they received a call on the police radio that the persons inside the Buick were engaged in criminal activity, but nothing in the record on this motion demonstrates that.

Reasonable suspicion must be "based on articulable facts" that the person stopped may be engaged in criminal activity. *Terry*, 392 U.S. at 21. An officer's reasonable suspicion should be based on "the totality of the circumstances—the whole picture." *Sokolow*, 490 U.S. at 8. Here, the record is devoid of any facts to suggest that Officers Schoenecker and Corlett had reason to suspect that the persons in the Buick had committed a crime. The key term is "articulable." The government offered extensive evidence to establish that other officers had reason to suspect that the persons in the Buick had committed a crime. But it offered no evidence to suggest that anyone communicated any basis for these suspicions to Officers Schoenecker and Corlett. Because of this, neither officer was able to articulate any grounds to justify the stop.

The purpose of a *Terry* stop is to provide law enforcement the opportunity to stop and question a person briefly when it believes that person may be committing or may have committed a crime. This was not a *Terry* stop; it was more akin to a warrantless arrest. The police stopped a car and immediately proceeded to remove a passenger, place him in custody in the back of a police car, and engage in a thorough search of the automobile. These actions might have been

proper if the officers had probable cause to arrest someone
in the car. As it was, the officers who made the stop failed to
articulate any facts addressing reasonable suspicion, still less
probable cause. For this reason, the stop did not conform to
the precepts outlined in *Terry* and was invalid.

Evidence seized as a result of an illegal stop is the fruit of
the poisonous tree and should not be introduced into evi-
dence. *See Sutterfield v. City of Milwaukee*, 751 F.3d 542, 568
(7th Cir. 2014) (citing *Wong Sun v. United States*, 371 U.S. 471,
484–86 (1963)). For this reason, we reverse the district court's
denial of their motions to suppress. Additionally, because
Sanders' conviction under Count 32 was due in part to evi-
dence seized as a result of an illegal stop, we vacate his con-
viction on this count and remand it to the district court for a
new trial.

### B. Phone Counts

Wilbourn was convicted of one count and Sanders three
counts of using a telephone in furtherance of a conspiracy in
violation of 21 U.S.C. § 843(b). In this case, the predicate nar-
cotics offense was the Freeman conspiracy alleged in the first
count of the indictment. Following their convictions, Wil-
bourn and Sanders moved for acquittal and a new trial. The
district court granted a new trial to both of them on the con-
spiracy charge (and to Wilbourn on two other counts) but
denied the motion on all other counts. On appeal, they argue
that the court should have granted its motion for acquittal
(or for a new trial) because the phone counts are factually
and legally dependent on the vacated conspiracy conviction.
Alternatively, Wilbourn argues that there was insufficient
evidence to support his conviction on this count.

We review *de novo* a district court's denial of a motion for acquittal, *United States v. Jones*, 763 F.3d 777, 807 (7th Cir. 2014), and the denial of a motion for a new trial for abuse of discretion, *United States v. Whiteagle*, 759 F.3d 734, 756 (7th Cir. 2014). We review a defendant's challenge to the sufficiency of the evidence by determining whether the record, read in the light most favorable to the government, contains sufficient evidence from which any rational juror could find the defendant guilty beyond a reasonable doubt. *Jones*, 763 F.3d at 807.

A defendant violates 21 U.S.C. § 843(b) if he knowingly and intentionally uses a telephone to facilitate the commission of a narcotics offense. *United States v. Arrellano*, 757 F.3d 623, 631 (7th Cir. 2014). Proof of an underlying narcotics offense is an element under § 843(b) and must be proven beyond a reasonable doubt. *See United States v. Campbell*, 534 F.3d 599, 605 (7th Cir. 2008). "[A] defendant cannot be convicted of using a telephone to commit a drug offense unless the defendant also aids or abets, or attempts to commit, the drug offense itself." *United States v. Mueller*, 112 F.3d 277, 281–82 (7th Cir. 1997).

But an acquittal of the underlying offense does not mean that there must be an acquittal on the phone counts. *United States v. McGee*, 408 F.3d 966, 985 (7th Cir. 2005). "Typically, a guilty verdict will stand (so long as the evidence is sufficient to support it) notwithstanding an inconsistent verdict on a related offense, even if conviction on the latter is a predicate to the conviction of the former." *United States v. Moore*, 763 F.3d 900, 910 (7th Cir. 2014).

The two sides disagree about the effect of the vacated conspiracy conviction. The government contends that it can

still serve as a predicate offense because, notwithstanding the ruling to vacate, the evidence still supports a finding beyond a reasonable doubt that both Wilbourn and Sanders participated in Freeman's conspiracy. In support, the government cites Justice Holmes' observation that consistency between jury verdicts is not necessary because each count in an indictment is regarded as if it were a separate indictment, *Dunn v. United States*, 284 U.S. 390, 393 (1932). By contrast, the defense argues that this is not a case of inconsistent verdicts but of false testimony contaminating a necessary element of the offense to such a degree as to render a guilty verdict impossible. By the defense's logic, once the court vacated the conspiracy conviction, it was required to vacate as well the phone counts that were predicated on the conspiracy.

Both of these positions, while accurate to some degree, fail to take full account of the issue as it stands on appeal. The government is correct to note that mere inconsistency among verdicts does not, in and of itself, mandate any particular disposition. This principle, long recognized, was reaffirmed in *United States v. Powell*, 469 U.S. 57 (1986), in which the Supreme Court declined to vacate a conviction under § 843(b) where the jury acquitted the defendant of the predicate offense but found her guilty of the phone counts. The court held that there was "no reason to vacate respondent's conviction merely because the verdicts could not be reconciled." *Id*. at 69 (citing *Dunn*, 284 U.S. 390).

But the defense is correct to note that the issue here is not inconsistent verdicts—the jury, after all, convicted both Wilbourn and Sanders of the phone counts *and* the predicate conspiracy. The issue, properly understood, is whether the

trial judge erred by vacating only the conspiracy and not the phone counts to which the conspiracy served as predicate. The government's arguments suggest that a trial judge is no more obligated than a jury to maintain consistency among jury verdicts.

We agree with this much: the mere fact that verdicts are inconsistent with each other is of no legal significance unless a party can demonstrate that such verdicts cannot coexist by operation of law. For this appeal, this means that the mere inconsistency among the verdicts is of no significance; what matters is whether the basis on which the judge vacated the conspiracy conviction is of such nature that it also mandated vacating the phone charges as well. This, of course, requires an examination of the facts as they relate to the elements of individual charges.

But it also involves something else not covered in full by the parties—a court's authority to remedy prosecutorial misconduct by vacating convictions. In addressing these questions, it is helpful to revisit briefly our decision in *Freeman*, which we summarized as follows:

> After a full review of the record, we hold that the district court did not err in finding that the government knowingly used false testimony and that there was a reasonable likelihood that the false testimony affected the jury's verdict on the conspiracy charge. Nor did the district court abuse its discretion in granting the defendants a new trial. In addition, the district court did not abuse its discretion by granting a new trial for the counts affected by the government's statements made in closing argu-

ments. Accordingly, the judgment of the dis-
trict court is affirmed.

650 F.3d at 683–84.

Several aspects of that holding are worth highlighting.
First, we recognized that the false testimony elicited by the
government affected the jury's verdict on the conspiracy
charge. Second, we recognized that the remedy afforded by
the judge, a new trial on various charges, was an act of dis-
cretion designed as a specific remedy. Third, we cited specif-
ic prosecutorial misconduct as the bases for these decisions;
the government elicited false testimony during the trial and
sought to defend this testimony at closing argument, albeit
with a different interpretation.

This serves to highlight the various considerations that
converged in the decision to grant a new trial; on one level,
the judge sought to negate the effect that tainted testimony
might have had against the various charges of disparate de-
fendants; on still another level, the judge sought to fashion a
remedy commensurate to the gravity of the misconduct.
Each of these requires discretion from the district judge.
Here, the judge was present during the weeks of trial and
was able to evaluate the gravity of the government's miscon-
duct and the ways in which it affected the individual de-
fendants. *Id.* at 681 ("For five weeks, the district court lis-
tened to this case; she had a feel for it that we can't replicate,
and that fact is not lost in our review of her decision.").

Of course, this is but a technical prelude to a simple
point: the tainted evidence harmed Wilbourn (and Freeman)
more than the other defendants, whereas the dismissal of the
conspiracy count benefited them all equally. We noted in

*Freeman* that virtually the whole of the false testimony of Seneca Williams centered upon Wilbourn and Freeman. *Id.* at 677 ("Williams testified at length about the penthouse, frequently placing Wilbourn there with Freeman and others discussing the drug trade. This included testimony about the defendants 'branding' their respective types of crack. This was a particularly damning piece of testimony … . [The government] solicited testimony about Wilbourn's presence at the penthouse; it even encouraged Williams to specifically detail Wilbourn's participation in Freeman's operation there… ."). Furthermore, the testimony was only demonstrated to be patently false insofar as it specifically identified Wilbourn as participating in various events while he was actually in jail. For this reason, we have little difficulty concluding that the same defects that were fatal to Wilbourn's conspiracy conviction are equally present in his phone charge under § 843(b). The government "must prove the commission of the underlying offense to obtain a conviction on a charge of telephone facilitation." *McGee*, 408 F.3d at 985. It did not do so, and the trial judge should have vacated that count as well. For this reason, we reverse the trial court's denial of Wilbourn's motion for a new trial, vacate Count 4, and remand it to the district court.

We decline, however, to vacate Sanders' convictions under § 843(b). In so doing, we recognize that the dismissal of Sanders' conspiracy charge—a perfectly correct ruling—owed more to addressing prosecutorial misconduct than to rectifying a verdict secured by bad evidence. The effect of Seneca Williams' testimony on Sanders is negligible compared to that of Wilbourn or Freeman. Williams' testimony was not a central component linking Sanders to Freeman's organization; it did not address the specific telephone con-

versations between Sanders and Freeman; and it did not address Sanders' defenses. In short, the introduction into evidence of the various phone calls between Sanders and Freeman, and the content of those calls, suffices to establish the predicate offense to support Sanders' convictions under § 843(b).

### C.  Premature Deliberations

We review a district court's handling of premature jury deliberations and juror bias for abuse of discretion. *United States v. Farmer*, 717 F.3d 559, 564 (7th Cir. 2013). The defendants argue that the discussion by three jurors on the fifth day of witness testimony denied the defendants their due process right to an impartial jury. They further contend that the trial judge was obligated to conduct a voir dire examination of the jury because there was a reasonable claim of juror bias.

A central duty of a trial judge is to ensure that a defendant enjoys a presumption of innocence throughout the trial. *Id.* To that end, every trial begins with a set of instructions to jurors to avoid discussing the case until the jury deliberates after the conclusion of the trial. Notwithstanding these directions, mistakes often occur, especially in longer trials. *Id.* ("It's a rare jury trial in which there are no mistakes on anyone's part."). For this reason, judges have a variety of measures they can take, including conducting a voir dire of the jurors, or admonishing the jury and instructing jurors to avoid discussing the case with anyone or forming an opinion about the resolution of the case until all the evidence has been presented. The appropriateness of a particular measure hinges, in large part, on the nature of the alleged misconduct. *See United States v. Stafford*, 136 F.3d 1109, 1112 (7th Cir.

1998) ("Not every allegation of jury misconduct is sufficiently substantial or sufficiently well substantiated to warrant putting the jurors on the spot.").

The trial judge heard arguments from both sides about how to address the alleged misconduct. The government argued that voir dire was likely to unsettle jurors who might fear that they were being observed outside of the courtroom. The defense, in contrast, sought to conduct voir dire. The trial judge decided to instruct the jury that: "[I]t is essential that you not talk about the case. And it is absolutely essential that you not make up your mind until you have heard all the evidence." Following the instruction, the judge asked the defense whether they sought removal of the jurors alleged to have participated in the conversation. The defense declined to have them removed.

The judge was within her discretion to handle the matter this way. Intra-jury discussions, such as the one at issue here, are viewed as less threatening than extra-jury influence or bias. *See United States v. Morales*, 655 F.3d 608, 632 (7th Cir. 2011). The discussion alleged here was certainly improper, but it was not so egregious that it required more stringent investigation or curative measures. Jurors are "presumed to follow limiting and curative instructions unless the matter before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds." *United States v. Harmon*, 721 F.3d 877, 886 (7th Cir. 2013) (citations omitted).

Here, the comments were not of such nature as to rebut the presumption that they could not be addressed by an instruction from the court. Nothing in the communications suggests that any juror was trying to lobby other jurors to

adopt a particular position or to interpret the evidence pre-
sented in accordance with a stated position. Finally, there is
no evidence that the statements had any lingering effects af-
ter the judge issued her instruction. The jury deliberated for
five days before arriving at its verdict. Significantly, the juror
alleged to have started the conversation did not take part in
the ultimate deliberations. Taken together, these facts do not
demonstrate that any alleged misconduct affected the basic
fairness of the trial.

### D. Motion for Mistrial

Wilbourn moved for a mistrial on the grounds that the
government entered evidence against him after he had rest-
ed his case. The judge denied the motion—a ruling that we
review for abuse of discretion. *United States v. Lauderdale*, 571
F.3d 657, 660 (7th Cir. 2009).

We quickly dispatch this issue because there is no evi-
dence to suggest that the trial judge abused her discretion in
denying Wilbourn's motion. "To win a new trial based on a
prosecutor's improper comments, a defendant must estab-
lish that the prosecutorial misconduct deprived him of his
right to a fair trial." *United States v. Johnson*, 655 F.3d 594, 602
(7th Cir. 2011). Here, there is no indication that the two ques-
tions posed by the prosecutor had any effect on the fairness
of the trial. Agent Delucio did not mention Wilbourn by
name; the testimony centered upon questions regarding the
availability of Freeman's brand of drugs and did not extend
beyond two brief questions; and the prosecutor did not men-
tion this testimony at closing argument. The judge instructed
the jury not to consider any evidence against an individual
defendant after that defendant has rested his case. Unless
rebutted, we presume that a jury will follow the court's in-

struction to limit its consideration of testimony in accordance with instructions received from the trial judge. *See Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 446 (7th Cir. 2010). Here, the defense has not brought forth any grounds to rebut this presumption and the judge was within her discretion to deny Wilbourn's motion for a mistrial.

### E. Wilbourn's Sentence

We review *de novo* a district court's interpretation of the guidelines and its findings of fact for clear error. *United States v. Samuels*, 521 F.3d 804, 815 (7th Cir. 2008). At sentencing, Wilbourn received enhancements for firearms and for having a supervisory role in Freeman's drug organization and a reduction for acceptance of responsibility. Additionally, the court found Wilbourn responsible for all of the drugs procured and sold by Freeman's organization from March 11, 2002, through May 24, 2007. Specifically, the court found Wilbourn accountable for 8.4 kilograms of cocaine base in the form of crack and 99.7 grams of heroin.

The court did this despite the fact that Wilbourn was in prison from April 23, 2002, until September 8, 2005. The court based its findings on two phone calls that Wilbourn conducted while in prison. The first call took place on October 3, 2003. In that call, Wilbourn urged Sanders to "step up" and fill in for him while he was in jail. The second call took place on January 13, 2004, wherein Wilbourn discussed a police raid on an apartment associated with Freeman's organization with a defendant named Hill.

The court calculated his offense level as 41 and his criminal history as III, which yielded a guidelines sentence of between 360 months to life imprisonment. The court originally

sentenced Wilbourn to 200 months' imprisonment but later reduced the sentence to 184 months.

First, the court provided ample grounds to support the imposition of the firearms and supervisory enhancements. The court noted various instances in which Freeman prepared and packaged drugs at Freeman's premises, the frequent communications between Wilbourn and Freeman on matters related to drug distribution, and the shared methods and personnel used by Wilbourn and Freeman to manufacture and distribute drugs. Pointedly, there is a recurring theme to these conversations: they repeatedly address the day-to-day operations of the organization and how to direct lower-level persons to carry out their duties. In other words, these are properly the conversations of two persons in management roles giving advice and direction to each other. Finally, the fact that we vacated Wilbourn's conviction for conspiracy has no bearing on this enhancement. At trial, a district court need only find by a preponderance of the evidence facts sufficient to support the enhancement. *United States v. Belk*, 435 F.3d 817, 819 (7th Cir. 2006). Here, there was sufficient evidence to find that Wilbourn and Freeman shared operations related to drug distribution and that Wilbourn had a supervisory role in those operations.

In contrast, the court committed clear error in concluding that Wilbourn was responsible for drugs produced and sold by Freeman during the period in which Wilbourn was incarcerated. The sole evidence supporting this finding was two phone calls, neither of which addressed drug distribution in anything but the most attenuated sense. The first call took place almost eighteen months *after* the beginning of Wilbourn's incarceration. In that call, Wilbourn encouraged

Sanders to fill his role within Freeman's organization. If anything, this call demonstrates that Wilbourn did not have an active role in Freeman's organization during that period; were it otherwise, he would not need Sanders to address the void created by his absence. The second call likewise fails to show any involvement by Wilbourn in Freeman's organization. Neither phone call discussed drug distribution specifically or anything involving the regular operations of Freeman's organization. To be sure, a person can participate in (or even lead) a conspiracy from a prison cell, but to do so requires that their actions inside prison have some effect on the operations of the conspiracy. There is no evidence that Wilbourn's actions in prison had any effect on the operation of the conspiracy.

For this reason, we vacate Wilbourn's sentence and remand it to the district court to make a drug amount finding that does not include the periods of time in which Wilbourn was incarcerated.

## III. Conclusion

For the reasons stated, we AFFIRM each of the district court's ruling except the following:

(1) We reverse the district court's denial of Sanders' motion to suppress evidence seized from the Buick and we vacate Sanders' conviction on Count 32 and remand it to the district court for a new trial; and

(2) We vacate Wilbourn's conviction under Count 4 and remand it to the district court for a new trial; and,

(3) We vacate Wilbourn's sentence and remand it to the district court with instructions to quantify an applicable drug quantity that does not attribute to Wilbourn amounts sold by Freeman's organization during those periods that Wilbourn was in jail.