Filed 5/14/21  P. v. Pilipina CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>DAVID RAQUE PILIPINA et al.,<br><br>    Defendants and Respondents. | H045025<br>(Santa Clara County<br>Super. Ct. No. CC952955) |

The People appeal from the grant of a new trial to defendants David Pilipina and Eddie Rivera.  In August 2009, 19-year-old Pilipina rode the VTA light rail train home with his family—including his pregnant girlfriend, his sister, and her young children—after seeing a movie at the Great Mall.  A group of Job Corps students rode the same train.  Believing Pilipina had made a negative (possibly threatening and possibly gang-related) comment to a member of their group, the Job Corps students directed abusive and threatening comments towards Pilipina during the ride.  Rivera, Pilipina's brother, was waiting at the VTA station platform when the train arrived.  Once off the train, a female Job Corps student and Pilipina's sister got into a physical fight.  Pilipina's sister was losing and tried to get the student to stop beating her up.  Pilipina, Rivera, and other Job Corps students got involved in the fight, portions of which were captured on surveillance videos.  Three Job Corps members were stabbed during the fight; one did not survive her injuries.

In 2016, jurors convicted Pilipina of one count of first degree murder and two counts of attempted murder and found true various enhancement allegations, including that Pilipina had committed the crimes for the benefit of, at the direction of, or association with a criminal street gang. Jurors convicted Rivera of second degree murder and two counts of attempted murder. As to Rivera, jurors also found true gang enhancement allegations and an allegation that Rivera had personally used a deadly weapon in the commission of one of the attempted murders.

Pilipina and Rivera filed new trial motions. In 2017, the trial court granted those motions, concluding that defendants' due process rights had been prejudicially violated by the prosecution's presentation of testimony that it should have known was false. The court further concluded that Rivera also was entitled to a new trial based on an instructional error regarding the natural and probable consequence theory of aiding and abetting.

The People, represented by the Santa Clara County District Attorney, appeal. Finding no manifest and unmistakable abuse of discretion, we shall affirm.

## I. BACKGROUND

### A. Factual Summary

#### 1. The Job Corps Group

Job Corps is an educational and career training program through which people between the ages of 16 and 24 can complete their high school education and obtain career training. Some Job Corps students live at Job Corps facilities, including one located in East San Jose.

On the evening of August 15, 2009, several San Jose Job Corps students went out. The group included Kristina P., Jamal G., Shaniqua M., Nevin G., Chante R., Cessaly R., Brianna C., and Brittany M. (collectively, the Job Corps group). After spending time at the Great Mall, the Job Corps group decided to go home.

2

## 2. *Pilipina and his Family*

Pilipina, then 19 years old, also was at the Great Mall on the evening of August 15, 2009. He was with his pregnant girlfriend, Alyssa L.; his teenaged sister, Desiree P.; his cousin, Gregory L.; his sister, Isabel S.; and her three- and six-year-old children (collectively, the Pilipina family). Rivera is Pilipina and Desiree's older brother. Rivera was not with them at the Great Mall.

## 3. *The Light Rail Train Ride*

Both the Job Corps group and the Pilipina family boarded the VTA light rail train at the Great Mall shortly before 10:00 p.m. and rode it to the Alum Rock station, an approximately 22-minute ride. Surveillance video from the train shows that Pilipina was wearing black shorts, a white T-shirt, and white gloves with black accents. Alyssa was wearing a white T-shirt; Gregory was wearing a tank top and a red baseball hat; Isabel was wearing a dark red T-shirt.

The Pilipina family boarded the train first. The Job Corps group walked down the aisle past the Pilipina family, who were sitting in the middle of the train car. The Job Corps group sat at the rear of the train car, behind the Pilipina family.

Nevin, who was wearing a red and black Cincinnati Reds hat with a "C" on it, testified that Pilipina said "what's up, cuz" to him as he passed. The comment made Nevin feel "awkward" because he was wearing red, which he knew to be a gang color, although he testified that he was not associated with any gang. On cross-examination, Nevin acknowledged that he told police that he did not think the comment was gang-related, but rather that Pilipina "was trying to get at [him] the wrong way."

The surveillance video shows that Pilipina turned his head towards the Job Corps group after they passed. He continued to look in their direction for about 15 seconds, at which point a man Pilipina apparently recognized boarded the train through a door located between Pilipina and the Job Corps group. Pilipina turned his attention to that man; they spoke briefly and shook hands. Pilipina then looked towards the back of the

3

train car a few times before getting up, walking to another train car, and chatting with other passengers for a couple of minutes before returning to his seat.

The surveillance video shows that, about 14 minutes into the ride, Nevin, who had been standing somewhat apart from the Job Corps group, moved next to Chante (his then-girlfriend) and told her something. His words cannot be heard on the surveillance video audio; he and others testified that he told the Job Corps group that Pilipina had said "what's up cuz" to him. Like Nevin, Chante interpreted the comment as "negative" and somehow related to the fact that Nevin was wearing a red hat. Shaniqua testified that the Job Corps group members were upset that Pilipina would assume Nevin was in a gang. She further testified that Pilipina's comment to Nevin "put us on edge as to, you know, watch your back, something could happen, or was he being targeted."

After Nevin spoke to Chante, she can be heard on the surveillance video saying, "Was he being rude?" and then, loudly, "Don't be talking to my boyfriend. I'll beat your ass." Someone from the Job Corps group, possibly Chante, can also be heard saying "He know. He ain't gonna be [unintelligible] with some little gloves on." Pilipina turned around towards the Job Corps group when that was said, but then looked forward again. Nevin characterized Chante's reaction as an "angry" "outburst." Brittany testified that Chante was talking very loudly and saying disrespectful things to the Pilipina family.

Over the next couple of minutes, women in the Job Corps group can be heard saying loudly "you fucked up, now"; "I'll beat somebody's ass"; and "I feel like fighting somebody." No reaction from the Pilipina family is apparent on the video. Shaniqua testified that Chante was trying to protect Nevin with her words.

About a minute after the comments stopped, at 10:16 p.m., Desiree used her cell phone to call Rivera, her brother; that call lasted 29 seconds. While Desiree was on that call, Pilipina got up and stood near the train door facing his family and, behind them, the Job Corps group. At 10:18 p.m., Desiree received a call from Rivera which lasted 32 seconds.

4

At 10:19 p.m., Shaniqua can be heard saying "I forgot I had scissors in my purse." She testified, and the video shows, that she then gave the scissors to Jamal. He can be seen on the video pulling his arm into his T-shirt through his sleeve; his arm reemerges seconds later. Shaniqua testified that she gave Jamal the scissors because she thought a fight might break out and she wanted him to be able to protect the group. She felt that Pilipina was watching their group.

Shortly before getting off the train, Isabel put her hair up in a bun and took items out of her pockets and placed them in Alyssa's purse.

The train arrived at Alum Rock and passengers began exiting the train at 10:22 p.m. Rivera arrived at the Alum Rock station around the same time on a bike.

*4.     The Fight*

A fight broke out between the Job Corps group and the Pilipina family shortly after both groups exited the train. The fight lasted approximately one minute. Portions of the fight were captured on surveillance videos.

Brittany testified that when they got off the train "the guy with the glove on . . . [p]ut his arms out and said, 'What's up?' " He was angry, and her interpretation was that he wanted to fight. Nevin testified that, when they got off the train, Pilipina yelled "Are you man enough to say what you were saying earlier?" Shaniqua heard a man say something along the lines of " 'come on. Let's go.' " Shaniqua further testified that the man "was jumping up and down and . . . accusing us of messing with them on the train, and now we're off, he wanted to see what was up."

Chante testified that Isabel began angrily yelling at Cessaly that the Job Corps group had cussed and been disrespectful on the train in front of her kids. Chante intervened. She and Isabel exchanged insults until Chante said something along the lines of, "we're either going to fight or we're not," at which point Isabel swung at her. Isabel missed; Chante retaliated, punching Isabel in the face several times while Isabel was backed up against the train. Isabel was bleeding from her nose and lip. Isabel told

5

Chante to stop multiple times. Chante stopped, but told Cessaly to "beat this bitch ass," at which point Cessaly started hitting Isabel. The fight involving Isabel is not visible on the surveillance videos.

Jamal stepped back onto the train at 10:22:20 p.m. Surveillance video shows that, once inside, he lifted his shirt slightly. He exited the train again after four seconds. He sat down on a bench outside the train at 10:22:36 p.m.; the handle of a pair of scissors can be seen in his right hand. Jamal testified that he did not remember why he got back on the train or why he was holding the scissors. On cross-examination, Jamal acknowledged that he told police that he never removed the scissors from his pocket.

Surveillance video shows that Pilipina, Alyssa, Desiree, and the children were walking away from the train at 10:22:23 pm. Seconds later, they turned towards the train (and, presumably, the fight). Pilipina walked back towards the train and out of view of the surveillance cameras. Nevin testified that while the girls fought, Pilipina "pulled out [a] knife and told everybody to, you know, to get the fuck back."

Approximately ten seconds after Pilipina walked back towards the train and out of sight of the surveillance video cameras, Rivera got off his bike and moved quickly in the direction of the train; at the same time, Alyssa ran toward the train.

About five seconds later, at 10:22:48 p.m., Alyssa and Kristina were tangled up in an apparent fight. A second after that, Pilipina lunged toward Kristina, who fell to the ground. A pointy object is visible in Pilipina's hand at 10:22:49 p.m. Alyssa ran away and out of the picture. Pilipina also turned away and exited the frame. At 10:22:51 p.m., Kristina got up, walked in the same direction as Pilipina and out of sight of the surveillance video camera.

Surveillance video shows that Jamal and Rivera were fighting at 10:22:51 p.m. Rivera struck Jamal twice in the left side. After they exit the frame, the scissors can be seen on the ground where they tussled. Jamal testified that he saw Rivera approach the fight, which made him suspicious, so he hit Rivera.

6

A different surveillance camera shows that Pilipina and Kristina fought briefly at 10:22:55 p.m. The same camera then shows that Pilipina leaned over Jamal, who was on the ground, at 10:22:58 pm. Nevin testified that he saw Pilipina stab Jamal. Jamal stood up at 10:23:03 p.m. and walked away from the fight and down the train platform.

Shaniqua testified that she saw Pilipina approaching the fight between Chante and Isabel. She stepped between him and the fight because she "didn't feel comfortable with him trying to interfere with the fight." She and Pilipina fought until he hit her in her "abdominal area." She "felt like all [her] breath" was taken out of her, and she walked away. She later saw that she had been stabbed. The fight between Pilipina and Shaniqua was not captured by the surveillance videos. Nevin testified that he saw Pilipina and Shaniqua fighting and saw Pilipina stab Shaniqua after Pilipina stabbed Jamal.

Kristina and Gregory fought from 10:22:57 p.m. until 10:23:02 p.m. At 10:23:20 p.m., Kristina sat down on a bench; in the surveillance video, a dark stain is visible on the front of her white tank top. At 10:23:31 p.m., she collapsed to the ground.

The Pilipina family left the scene. The Job Corps group called for help and were interviewed by police.

Kristina was stabbed three times and did not survive her wounds. She was stabbed in the front of the right shoulder, the right abdomen (a wound that involved the liver), and the chest (a wound that involved the heart).

Jamal was stabbed three times in the left side. He did not feel the stabbing occur and was unaware of his wounds until after he walked away and saw blood. His injuries included a punctured lung and required surgery and a week-long stay in the hospital.

Shaniqua was stabbed once on her right side. She had surgery and spent several days in the hospital.

### 5. *The Investigation*

Police found a pair of scissors and a three-inch knife tip that had broken off from the blade on the train platform. Police recovered a knife handle across the street from the light rail station. The broken blade and handle appeared to be parts of the same knife.

No blood was found on the scissors. Nor was blood found on the broken knife blade. However, Jamal's DNA was found on the broken knife blade. A DNA mixture from at least two people was found on the knife handle. The prosecution's DNA expert concluded that it was 5,500 times more likely that the DNA mixture on the knife handle originated from Rivera and another unknown person than from two unknown people. Jamal, Gregory, and Pilipina were excluded as contributors to the DNA mixture on the knife handle.

### 6. *Gang Evidence*

Michael Whittington, a criminal investigator with the Santa Clara County District Attorney's Office, testified for the prosecution as a gang expert. He opined that the phrases "Do you bang?", "What hood you from?", and "What's up cuzz?" are "checks" or "challenge[s]" gang members use to determine whether the recipient is a rival gang member. Such challenges typically precede an assault. He further testified that, in gang culture, respect is paramount and disrespect is met with violence.

According to Whittington, the Crips were originally formed in 1969 in East Los Angeles. Crips associate with the color blue. The word "cuz" is a term of endearment when used between Crips and a challenge when said to a non-Crip. The Bloods are the Crips' primary rival.

When writing, Crips commonly will avoid writing "b," because it represents the Bloods, or will write "bk" (meaning Blood killer) in place of "b." Also, "Crips typically will not use [words] where there's a ck [because t]hat means Crip killer." They might substitute "cc" for "ck"; for example, a Crip might spell "block" with two c's—"blocc."

The Crip gang is informal in that the various subsets do not take orders from or pay dues to any higher organization. No permission is needed to form a new Crip subset. Today, there are many Crip subsets in San Jose, which tend to be multiracial and multicultural. Crips in San Jose are allied with Norteños, largely because the gangs share a common enemy—Sureños.

Whittington testified that the San Jose Boyz are a Crip subset. He opined that Pilipina was a member of that gang, based in part on the fact that he has a tattoo that reads "Q Blocc" and based on pictures of him throwing Crip gang signs. Whittington opined that Rivera also was a member of the San Jose Boyz based in part on his tattoos ("certified boyz," "SJB," and "BK"); his text message signature line at the time of the incident ("SJB.loyalty.cuz"); and a 2007 police encounter during which Rivera self-identified as "SJB." Whittington opined that the stabbings were committed in association with and for the benefit of a criminal street gang, the San Jose Boyz. On cross-examination, Whittington testified that he had never encountered a Blood wearing an article of clothing with a "C" on it.[1]

Ross Lacuin testified that he belonged to the San Jose Boyz gang in 2007 along with Pilipina and Gregory. He testified that they were Crips, that "cuz" is lingo for "Crip," and that "what's up cuz" is a gang challenge. Lacuin identified a picture of himself, Pilipina, and Gregory and testified that in the picture he and Pilipina were throwing San Jose Boyz and Crips gang signs. Lacuin testified that Gregory was throwing a "14" sign because he was a Norteño. (The apparent inconsistency in Lacuin's testimony about Gregory's gang membership—that is, whether he was a member of the San Jose Boyz, a Norteño, or both—was not explored.) Lacuin testified that Norteños and San Jose Boyz were allied.

---

[1] Nevin testified that he knew members of the Bloods in Los Angeles who wear Cincinnati Reds hats like the one he was wearing on the night of the stabbings. His hat bore the letter "C."

### 7. *Defense Expert Testimony*

Kris Mohandie, Ph.D., a clinical police and forensic psychologist, testified for the defense as an expert in the psychophysiology of the human fear response (i.e., the fight or flight response). He testified that fight or flight refers to the way humans react to threats and danger and that it involves a series of physiological changes that are perceptual, cognitive, and behavioral. When a person is experiencing a fight or flight response, their decision-making becomes more reactive and less logic-based. He opined that a fight or flight reaction could have been triggered in someone in Pilipina's position by the combination of the threats on the train, the aggression against his sister, being outnumbered, and the presence of a pregnant girlfriend and young children whom he felt a responsibility to protect.

## B. *Procedural History*

The Santa Clara County District Attorney charged Pilipina and Rivera with one count of murder (Pen. Code, § 187; count 1)[2] and two counts of attempted murder (§§ 664, subd. (a), 187; counts 2-3). As to each count, the information included gang and personal use of a deadly weapon enhancement allegations against Pilipina and Rivera. (§§ 186.22, subd. (b)(1)(C); 12022, subd. (b)(1).) The information also alleged that Pilipina personally inflicted great bodily injury on Jamal (count 2) and Shaniqua (count 3). (§ 12022.7, subd. (a)).

The case proceeded to trial in November 2015. Pilipina's counsel argued that, if he stabbed the victims, he did so to defend himself and his family members. Alternatively, Pilipina's counsel argued that Pilipina acted in imperfect self-defense or in heat of passion. Rivera also asserted self-defense and defense of others. His counsel also argued that he lacked the mental state—namely, the knowledge and intent—to aid and abet the crimes.

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

10

The jury deliberated for approximately three days before returning its verdicts on January 11, 2016. Jurors found Pilipina guilty of first degree murder and of both counts of attempted murder and found true all the enhancement allegations. Jurors convicted Rivera of second degree murder and of both counts of attempted murder. As to Rivera, jurors found the gang enhancement allegations and the personal use of a deadly weapon allegation as to count 2 true, but they found false the personal use of a deadly weapon allegation as to count 3.

Pilipina and Rivera each moved for a new trial. The trial court granted those motions on May 10, 2017. The People timely appealed.

## II.    DISCUSSION

### A.    *Legal Principles—New Trial Motions and Standard of Review*

Statutory grounds for ordering a new trial are set forth in section 1181. They include instructional error and prosecutorial misconduct. (§ 1181, subd. (5).) Nonstatutory grounds exist as well. Specifically, "the trial court's constitutional duty to ensure that defendants are accorded due process of law provides the court with the authority to grant a new trial when the defendant did not receive a fair trial even though the cause of that unfairness is not expressly recognized as a ground for granting a new trial under section 1181." (*People v. Alaniz* (2017) 16 Cal.App.5th 1, 9, fn. 5 [citing cases].) Under *Brady v. Maryland* (1963) 373 U.S. 83, " '[t]he prosecution has a duty under the Fourteenth Amendment's due process clause to disclose evidence to a criminal defendant when the evidence is both favorable to the defendant and material on either guilt or punishment.' " (*People v. Stewart* (2020) 55 Cal.App.5th 755, 769.) Thus, a *Brady* violation can support the grant of a new trial. (See *id.* at p. 784; *People v. Uribe* (2008) 162 Cal.App.4th 1457, 1482.)

" 'A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action

11

will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' " [Citation.]' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 730.) Where the trial court *grants* a new trial, its order "will not be disturbed if fairly debatable, even if the reviewing court itself, addressing the issues de novo, would not have found a basis for reversal. [Citations.] In particular, the traditional rule is that the reviewing court will not substitute its judgment for the trial court's determination that *error was prejudicial*, and thus warrants a new trial." (*People v. Ault* (2004) 33 Cal.4th 1250, 1263 (*Ault*).) The rationale underlying that traditional rule is that "[a] trial court's finding of prejudice is based, to a significant extent, on ' "first-hand observations made in open court," ' which that court itself is best positioned to interpret. [Citations.]" (*Id.* at p. 1267.)

An abuse of discretion occurs when a ruling "rests on an error of law" (*People v. Cannedy* (2009) 176 Cal.App.4th 1474, 1483), exceeds the bounds of reason, or is arbitrary. (*People v. Andrade* (2000) 79 Cal.App.4th 651, 659.) A trial court also abuses its discretion "when the factual findings critical to its decision find no support in the evidence." (*People v. Cluff* (2001) 87 Cal.App.4th 991, 998.) "The trial court's factual findings, express or implied, made on a motion for new trial will be upheld if supported by substantial evidence." (*People v. Drake* (1992) 6 Cal.App.4th 92, 97.)

"[W]e review the correctness of the court's ruling, not its reasoning." (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1254 [appeal from grant of new trial].) An order granting a new trial motion may be affirmed on any ground raised in the motion "without regard to the particular reason given" by the trial court. (*People v. Montgomery* (1976) 61 Cal.App.3d 718, 728.)

**B.** *The Trial Court Did Not Err in Granting a New Trial on Due Process Grounds*

*1. Factual Background*

Defendants moved in limine to exclude Nevin's description of Pilipina's gloves as " 'Murder Ones.' "  The trial court granted that motion and excluded the evidence under Evidence Code section 352.  During the discussion of that in limine motion, the prosecutor represented that "officers will testify as to their training and experience that people who are involved in knife fights wear gloves for several reasons . . . ."  Pilipina's counsel responded:  "We have not received any discovery regarding any expert opinion from any police officer that people involved in knife fights wear gloves, so if that discovery exists, I would like that discovery."  Apparently no such discovery was provided.

Herman Leon, a detective with the Santa Clara County Sheriff's Office, was the lead investigator in the case.  At an Evidence Code section 402 hearing, he testified that "it would not surprise" him that a person who is going to commit a stabbing "would put on a pair of gloves."  On cross-examination, Leon testified that he had investigated between 50 and 100 stabbings and he could think of only a single other case in which the perpetrator wore gloves.  The court asked Leon what percentage of witnesses to stabbings state that the perpetrator wore gloves.  Leon "estimate[d] maybe 30 to 40 percent."  On recross, Leon agreed that his estimate was "pretty much speculation."  The court again followed up, asking Leon whether he was speculating or making an educated guess.  Leon responded that it was an educated guess.  The court allowed the testimony.

Leon testified in front of the jury that "[o]n the conservative side, . . . 30 percent to 40 percent" of suspects used gloves in the stabbings he had investigated.  On cross-examination, Leon testified that he had investigated "easily 100" stabbing cases and that he could recall just two other specific cases in which the perpetrator wore gloves.

13

The following day, Pilipina's counsel requested that the court strike the testimony on grounds that it was "unreasonable, prejudicial, irrelevant, and, most of all, unfair" or "permit some investigation into San Jose Police officer records at least for a year period because it's *Brady*." The court denied those requests and advised counsel to have his own witnesses controvert Leon's opinion. The issue apparently was not raised with other witnesses.

In his rebuttal closing argument, the prosecutor referred to Pilipina's gloves as "murder gloves," which defendants interpret as a reference to Leon's testimony. Specifically, the prosecutor argued that—as required to establish aiding and abetting liability—Rivera knew that Pilipina intended to kill because "Pilipina pulled out the knife, brandished it, and ha[d] threatened people and yelled 'Get the F back.' That is the evidence that [Rivera] knew this guy who is wearing his murder gloves is going to commit another gang crime. Plus, [Rivera]'s been called there and shows up with his knife."

Two-and-a-half weeks after the jury rendered its verdicts, Pilipina served a subpoena on the Santa Clara County Sheriff's Department seeking all sheriff reports from January 1, 2007 to December 9, 2015 involving non-custodial stabbings. Deputy County Counsel Donald Larkin testified at a May 2016 hearing that it was not possible "to review every single police report generated by the Sheriff's Office" as would be required "in order to comply fully with the subpoena . . . ." Instead, the County obtained a list of stabbings handled by the Sheriff's Office from the District Attorney's Office, which generated the list from an internal database. The Sheriff's Office then produced the reports associated with the listed cases that were responsive to the subpoena. Larkin represented that he could not "certify that we've provided all noncustodial stabbings, but we have made a good-faith effort to locate what we can." Larkin produced 31 sheriff reports in May 2016; another 73 sheriff reports were produced in August 2016. Based on its review of the documents, the trial court found "[t]wo incidents, including the instant

14

case, involv[ing] suspects who wore gloves." That is, the perpetrator was wearing gloves in fewer than two percent of the reported cases.

### 2. *Defendants' New Trial Motions and the Trial Court's Order*

Defendants' new trial motions were based in part on the prosecutor's presentation of Leon's statistical testimony (which defendants argued was false) and the prosecutor's failure to produce the sheriff reports undermining that testimony in discovery. In arguments joined by Rivera, Pilipina argued that the prosecutor committed misconduct by presenting the false testimony, such that a new trial was warranted under section 1181(5), and that the prosecutor violated *Brady* by failing to produce the sheriff reports. Pilipina also argued that the prosecutor "knew or should have known" that Leon's statistical testimony was false and that he was entitled to a new trial under the federal due process clause. In an argument joined by Pilipina, Rivera argued that the admission of the false testimony deprived him of a fair trial and violated his right to due process.

With respect to prejudice, Pilipina argued that the "false testimony provided the jury with a basis to find that [he] acted with premeditation, the intent to kill, and without the intent to defend himself or his family, or in the heat of passion . . . ." For his part, Rivera argued that Leon's glove testimony allowed the prosecutor to argue and the jury to infer that Rivera had the requisite knowledge required for aiding and abetting—namely, that Pilipina intended to commit murder and attempted murder because he was wearing gloves.

The trial court granted the new trial motions based in part on the foregoing arguments. From the subpoenaed sheriff reports, the court concluded that "Detective Leon's 30-40% statistic is not factually supported and may actually be false." The court went on to twice refer to the statistical testimony as "false" and to consider its impact "on the defendants' right to a fair trial." After considering the evidence pertaining to defendants' mental states, the court was "not convinced that the jury would have reached

15

the verdict it did had they not heard Detective Leon's testimony that 30-40% of stabbing defendants wear gloves."

### 3. *The District Attorney Fails to Show an Abuse of Discretion*

The parties dispute the basis for the trial court's ruling. The District Attorney argues that the trial court erroneously granted the motions pursuant to section 1181(5) without finding that the statistical testimony was false or that the prosecutor knew of any falsity. Defendants maintain that the court did find the statistical testimony to be false and granted the motions on due process grounds because the admission of that testimony deprived them of a fair trial.

The statement of decision is not without ambiguity. However, like defendants, we read it as finding the statistical testimony to be false. While it is true that the court initially stated that the police reports showed that the testimony "may actually be false," the court went on refer to the testimony as unqualifiedly "false" on two occasions. The order as a whole makes clear that the court found the testimony to be false. We likewise agree with defendants that the trial court granted their new trial motions based on their more general due process argument (as opposed to the more specific *Brady*-based due process claim). We ground that conclusion on the court's statement that it was "consider[ing] the impact the false statistical evidence had on the defendants' right to a fair trial." " 'It is axiomatic that when an accused is denied that fair and impartial trial guaranteed by law, such procedure amounts to a denial of due process of law . . . .' " (*People v. Davis* (1973) 31 Cal.App.3d 106, 110.)

### a. *Legal Framework – False Evidence and the Denial of Due Process*

" 'Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents, even if the false evidence was not intentionally submitted.' [Citation.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 716 (*Morrison*); *Napue v.*

16

*Illinois* (1959) 360 U.S. 264, 269 ["a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment"]; *Giglio v. United States* (1972) 405 U.S. 150, 153 ["the presentation of known false evidence is incompatible with 'rudimentary demands of justice' "].)  The prosecution's duty not to present (or, if presented, to correct) false evidence applies both where the prosecutor knows of the falsity and where he or she *should know* of the falsity. (*Morrison*, *supra*, 34 Cal.4th at p. 716.)  Because "the prosecutor has a duty to investigate and disclose favorable evidence known only to the police, he 'should know' when a witness testifies falsely about such evidence." (*Jackson v. Brown* (9th Cir. 2008) 513 F.3d 1057, 1075 (*Jackson*); see *Morrison*, *supra*, at p. 717 ["obligation [to correct false testimony] applies to testimony whose false or misleading character would be evident in light of information known to the police involved in the criminal prosecution"].)  It is also the case that, "when the government learns that part of its case may be inaccurate, it must investigate." (*United States v. Freeman* (7th Cir. 2011) 650 F.3d 673, 680 (*Freeman*).)  "[A] *Napue* violation requires that the conviction be set aside whenever there is '*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury.' " (*Jackson*, *supra*, at p. 1076.)

b.      *Substantial Evidence Supports the Court's Finding of Falsity*

The court's finding that Leon's statistical testimony was false—in the sense that it was inaccurate—is supported by the evidence.  Leon testified that "30 percent to 40 percent" of stabbing suspects wore gloves in the 100-plus stabbings he had investigated.  Sheriff reports from his time as an investigator showed the actual statistic to be under two percent.

The trial court did not address whether Leon intentionally lied, thereby committing perjury, or simply made a good faith error.  For our purposes, "it matters not whether the witness giving false testimony was mistaken or intentionally lying." (See 6 Wayne R.

17

LeFave, et al., *Criminal Procedure* (4th ed. 2020) § 24.3(d); *Freeman*, *supra*, 650 F.3d at p. 680 [rejecting argument "that a claim under *Napue* can only be made when it can be established that the witness is lying"]; *Hayes v. Brown* (9th Cir. 2005) 399 F.3d 972, 980 ["*Napue*, by its terms, addresses the presentation of false *evidence*, not just subornation of perjury"]; *United States v. Harris* (3d Cir. 1974) 498 F.2d 1164, 1169 [*Napue* applies regardless of whether the witness who provided the false testimony intended to lie]; but see *Henry v. Ryan* (9th Cir. 2013) 720 F.3d 1073, 1084 [*Napue* claim requires showing that witness knowingly lied and cannot be based on mistaken or inaccurate recollection].)

c.　　　*Substantial Evidence Supports the Court's Implicit Finding of Knowledge*

The record also supports an implicit finding that the prosecutor should have known of the falsity of the statistical testimony. Leon's testimony at the Evidence Code section 402 hearing should have put the prosecutor on notice that Leon's statistical testimony might be inaccurate. In particular, Leon testified that he had not conducted any research on the frequency with which stabbing suspects wear gloves, nor had he reviewed the stabbing cases he had investigated. He acknowledged that the 30 to 40 percent statistic was the product of speculation or, at best, was an "educated guess" and that he could not "testify with specificity." Having been put on notice, the prosecutor had an obligation to investigate to determine the accuracy of Leon's statistical testimony. (*Freeman*, *supra*, 650 F.3d at p. 680 [government has obligation to investigate where it learns witness testimony may be false].)

Moreover, evidence of the testimony's falsity—the sheriff reports—were in the possession of the investigating agency, the Sheriff's Office. And the database used to identify those reports was in the possession of the District Attorney's Office. Thus, had the prosecutor fulfilled his duty to investigate, he would have learned of the testimony's falsity. (See *Morrison*, *supra*, 34 Cal.4th at pp. 717 ["obligation [to correct false

18

testimony] applies to testimony whose false or misleading character would be evident in light of information known to the police involved in the criminal prosecution"].)

### d. The Trial Court did not Abuse its Discretion in Finding Prejudice

As previously noted, in reviewing an order granting a new trial motion, we "will not substitute [our own] judgment for the trial court's determination that *error was prejudicial*, and thus warrants a new trial." (*Ault*, *supra*, 33 Cal.4th at p. 1263.) The government's introduction of false testimony is prejudicial "whenever there is '*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury.' " (*Jackson*, *supra*, 513 F.3d at p. 1076.)

Here, the trial court stated that it was "not convinced that the jury would have reached the verdict it did had they not heard Detective Leon's testimony that 30-40% of stabbing defendants wear gloves." We read the foregoing as a conclusion that it was reasonably likely that the false testimony could have affected the jury's judgment. For the reasons discussed below, the District Attorney has failed to show that the trial court abused its discretion in drawing that conclusion.

In finding that Pilipina suffered prejudice, the trial court noted that his mental state, including whether he intended to kill and whether he acted with premeditation, was a critical issue at trial. The court considered the other evidence of Pilipina's intent and premeditation and concluded that evidence "could just as easily have been viewed by the jury as evidence that Pilipina intended to fight and not that he was planning a murder." The court also noted that "the defense provided strong expert testimony regarding self-defense and defense of others, especially of Isabel . . . , who suffered a beating at the hands of the Job Corps group." Turning to the impact of the false evidence, the court reasoned that jurors may have given the testimony "relatively great weight" because Leon was the lead detective and an expert. The court also found significant the prosecutor's reference to "murder gloves" in his rebuttal closing, which the court viewed as evoking

19

the false statistical evidence.  The court reasoned that "closing and rebuttal arguments leave a significant impression on the jury, especially in the context of this three-month-long trial."  Given the absence of clear evidence of intent to kill and premeditation and the strong evidence of self-defense and defense of others, the court concluded that the false statistical testimony prejudiced Pilipina.  As to Rivera, the trial court noted the dearth of evidence that he knew of Pilipina's intent to stab the victims and the prosecutor's reliance on the "murder gloves" to establish that knowledge in finding prejudice.

The court did not abuse its discretion in concluding that the false testimony prejudiced defendants.  The evidence that Pilipina intended to kill and acted with premeditation was hardly overwhelming.  The prosecutor relied on the phone calls between Desiree and Rivera, which the prosecutor characterized as a call for backup.  But the content of those calls is unknown, making that evidence minimally probative.  The prosecutor also pointed to the fact that Kristina was stabbed three times, which certainly can support inferences of intent to kill and premeditation.  But the infliction of multiple wounds is not necessarily inconsistent with an individual acting in the heat of passion, self-defense, or defense of another (whether reasonably or unreasonably).  Finally, the prosecutor relied on Pilipina's gang membership and gang expert testimony that gang members respond to disrespect with violence.  However, violence could mean an assault short of killing.  Meanwhile, the evidence that Pilipina acted in the heat of passion, self-defense, or defense of another was relatively strong.  It included evidence that he initially walked away from the train and the Job Corps group, returning only after his sister started getting beat up by multiple women; the presence of his pregnant girlfriend who also was pulled into the fight; the fact that his family was outnumbered by the Job Corps group, which had made threatening and aggressive comments to his family on the train; and the fact that members of the Job Corps group—namely, Jamal and Shaniqua—admittedly initiated their physical encounters with the Pilipina family.  The false

20

testimony was prejudicial to Pilipina because it allowed jurors to infer premeditation and an intent to kill, and to reject Pilipina's defenses, based on his decision to wear gloves.

Turning to Rivera, the evidence the prosecutor relied on to establish Rivera's knowledge of Pilipina's unlawful purpose consisted of the phone calls between Rivera and Desiree (the content of which is unknown), the fact that Rivera met the train while armed, and the fact that Pilipina brandished his weapon and told others to "get the F back," which the prosecutor urged jurors to infer Rivera saw. Even assuming the foregoing evidence supports an inference that Rivera arrived to back up his family in a planned attack on the Job Corps group, that is not the only reasonable inference. Jurors also could have concluded that Rivera met the family to walk them home, or because he had plans with one or more of them, or because the family felt threatened by the Job Corps group. Jurors could have concluded that Rivera was armed because of his gang membership or because it was a rough neighborhood. There also was evidence that Rivera acted in the heat of passion, self-defense, or defense of another, including that his sister was getting beat up and that Jamal started a fight with him while holding scissors. The false testimony was prejudicial to Rivera because it allowed jurors to infer that Pilipina's gloves sent Rivera a message that Pilipina intended to kill.

Of course, the question on appeal is not whether we would have reached the same conclusions as to prejudice, but whether the District Attorney has shown a manifest and unmistakable abuse of discretion by the trial court. He has not. He argues that defendants suffered no prejudice because Leon's statistical testimony was of little importance and, in any event, "no reasonable juror would have credited" it. The trial court judge—based on her first-hand observation of the trial—disagreed. She concluded that the testimony may have been credited by jurors (indeed, she believed jurors may have given it "relatively great weight") and impactful enough to influence the verdict. We may not substitute our judgment, let alone the District Attorney's judgment, for the trial court's in these circumstances. (*Ault*, *supra*, 33 Cal.4th at p. 1263.)

21

The District Attorney also takes the position that the false testimony could not have been prejudicial because the trial court explicitly concluded that the sheriff reports undermining it were not material for purposes of *Brady*. That argument is based on a misreading of the statement of decision. After an extensive discussion of the prejudice defendants suffered, the court stated "[w]hile this material"—referring to the sheriff reports—"may not be exculpatory under *Brady*, it is surely impeachment evidence reflecting on Detective Leon's credibility." The court then cited two cases with parenthetical descriptions. First, it cited *People v. Elder* (2017) 11 Cal.App.5th 123, 132 (*Elder*) with the parenthetical: "exculpatory evidence that must be disclosed under Penal Code section 1054.1 is broader than exculpatory evidence under *Brady*." As *Elder* explains, the Penal Code requires "the prosecution [to] provide to a defendant all exculpatory evidence, not limited to the 'material' exculpatory evidence required under federal constitutional standards established by *Brady* . . . ." (*Elder*, *supra*, at p. 132.) The court also cited *People v. Garcia* (1993) 17 Cal.App.4th 1169, 1179 with the parenthetical: " '[t]he duty to disclose evidence favorable to the accused extends to evidence which may reflect on the credibility of a material witness.' " That citation from *Garcia* refers to the fact that, under *Brady*, favorable evidence includes impeachment evidence.

The District Attorney reads the foregoing portion of the statement of decision as concluding that the sheriff reports were not material. He appears to base that reading on the citation to *Elder*, which, as noted, addresses *Brady*'s materiality requirement. In isolation, the citation to *Elder* supports the District Attorney's interpretation. However, the citation to *Garcia* for the proposition that impeachment evidence is *Brady* material undermines that reading. Moreover, the District Attorney's reading simply cannot be squared with the court's statement of decision as a whole, which plainly found prejudice. We read the portion of the decision on which the District Attorney relies as distinguishing between exculpatory and impeachment evidence—both of which are deemed favorable

22

under *Brady* (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282 ["The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"])—and concluding that the sheriff reports were impeachment as opposed to exculpatory evidence.

> e.      *Defendants Moved for a New Trial on the Basis of a False Evidence-Based Due Process Claim*

The District Attorney argues that defendants' reliance on *Napue* on appeal is misplaced, noting that neither the trial court's statement of decision nor defendants' new trial motions cited it.  The District Attorney is correct, but we disagree to the extent the District Attorney is implying that defendants failed to raise a due process claim based on the prosecutor's presentation of false evidence.  As discussed above, in the trial court, defendants squarely relied on the due process clause, characterized the statistical evidence as false, and faulted the prosecutor for presenting it.  Pilipina's motion, which Rivera joined, argued that the prosecutor "knew or should have known" that Leon's statistical testimony was false.  Defendants' joint notice of motion cited *Giglio*, a leading case (along with *Napue*) in the governing jurisprudence.  The well-established rule regarding due process and the presentation of false evidence is that the prosecution's knowing presentation of false evidence violates due process.  Defendants' reliance on these principles was clear.

The absence of case citations in the statement of decision also is not dispositive. We presume the trial court knew and followed the governing law.  (*People v. Braxton* (2004) 34 Cal.4th 798, 814.)  And the court's analysis aligns with *Napue* and its progeny.

> 4.      *Remedy*

The District Attorney argues that, assuming there was prejudicial error, the proper remedy as to Pilipina is to reduce his conviction for first degree murder to a second degree murder conviction on the theory that the false testimony was relevant only to premeditation.  We disagree.  While the trial court noted the relevance of the false

23

testimony to the issue of premeditation, it also referenced Pilipina's defenses of self-defense and defense of others, suggesting that the false testimony may have led jurors to reject those otherwise strong defenses. Read as a whole, the statement of decision makes clear that the trial court viewed the false evidence as influencing the jury's assessment of Pilipina's mental state generally. In this case, that assessment required jurors to consider not only whether Pilipina premeditated Kristina's killing, but also—for purposes of all the charges—whether he acted in the heat of passion, whether he believed that he or someone else was in imminent danger of being killed or suffering great bodily injury, whether he believed that the immediate use of deadly force was necessary to defend against that danger, and the reasonableness of any such beliefs. (CALCRIM Nos. 505, 571 [perfect and imperfect self-defense and defense of another.) Accordingly, a new trial on all counts is the proper remedy.

The trial court also granted Rivera a new trial based on its failure to give "sufficient instructions regarding the contours of the natural and probable consequences theory of liability." The District Attorney contends that was error. We need not reach that argument, having concluded that the trial court properly granted Rivera a new trial on due process grounds.

III. DISPOSITION

The order granting a new trial is affirmed.

24

_____

ELIA, ACTING P.J.

WE CONCUR:


_____

GROVER, J.


_____

DANNER, J.


*People v. Pilipina et al.*
H045025